IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| MAX MCCOY, | ) |
| Plaintiff, | ) ) ) |
| | ) No. 14-cv-03558 |
| v. | ) |
| | ) Judge Andrea R. Wood |
| WEXFORD HEALTH SOURCES, INC., SALEH OBAISI, M.D., and ANDREW TILDEN, M.D., | ) ) ) ) |
| Defendants. | ) |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Max McCoy, an inmate in the custody of the Illinois Department of Corrections ("IDOC"), claims that he suffered an injury to his toe that has caused him chronic pain. According to McCoy, Defendants Saleh Obaisi and Andrew Tilden were deliberately indifferent to his serious medical condition in violation of the Eighth Amendment to the United States Constitution. McCoy thus has brought this civil rights action under 42 U.S.C. § 1983 against those individual Defendants as well as their employer, Wexford Health Sources, Inc. ("Wexford"). Before the Court is Defendants' motion for summary judgment. (Dkt. No. 101.) For the reasons explained below, the motion is denied.

**BACKGROUND**

Unless otherwise noted, the following facts are undisputed. On July 10, 2014, while incarcerated at Stateville Correctional Center ("Stateville"), McCoy injured the big toe on his right foot when he kicked his cell door. (Pl.'s Resp. to Defs.' Statement of Facts ("PRDSF") ¶ 7, Dkt. No. 111.) That same day, McCoy was examined by Dr. Obaisi, the medical director at Stateville. (*Id*. ¶¶ 3, 8.) Dr. Obaisi is employed by Wexford, a private corporation that has

contracted with IDOC to provide medical services to inmates at IDOC facilities, including Stateville and Pontiac Correctional Center ("Pontiac"), where McCoy later transferred. (*Id*. ¶ 5.) During the July 10 visit, Dr. Obaisi examined McCoy's toe, ordered an x-ray, prescribed him ibuprofen, and provided him with a crutch. (*Id*. ¶ 8.) The x-ray results indicated that McCoy's toe was neither fractured nor dislocated. (*Id*. ¶ 9; Obaisi Dep. at 61:21–24, Ex. B to Defs.' Statement of Facts ("DSF"), Dkt. No. 103.)

On July 15, 2013, McCoy's crutch slipped, and he fell in the mess hall. (*Id*. ¶ 10.) That day, Dr. Obaisi again evaluated McCoy and diagnosed him with an acute sprain of his big toe. (*Id*. ¶ 11.) During that visit, Dr. Obaisi ordered a medical lay-in permit and a low-bunk and low-gallery permit, provided McCoy with a second crutch, increased the prescription for ibuprofen, prescribed a stronger pain medication, ordered that his toe be iced twice daily for a week, and ordered him to follow up as needed. (*Id*. ¶ 12.) On July 23, 2013, Dr. Obaisi again evaluated McCoy's toe, noted bruising and swelling, and diagnosed him with a contusion. (*Id*. ¶ 13.) A contusion is a bit more severe than a sprain and can take months to resolve fully. (*Id*.) During this visit, Dr. Obaisi ordered an additional x-ray of McCoy's right foot on the theory that an x-ray taken on the first day of trauma may not reveal a hairline fracture. (*Id*. ¶ 14.) The second x-ray revealed no broken bones and ruled out a fracture of the big toe. (*Id*. ¶ 15.)

On August 7, 2013, McCoy met with Dr. Davis, another physician at Stateville, who ordered another x-ray to rule out an intraarticular facture. (*Id*. ¶ 16.) The x-ray report indicated no fracture. (*Id*. ¶ 17.) On November 11, 2013, McCoy was evaluated by a nurse, who noted that McCoy's right big toe was swollen and that there was a small lump on the bottom of the toe. (*Id*. ¶ 18.) On the nurse's report, she noted "turf toe" and tendonitis on the right toe. (*Id*. ¶ 19.) Tendonitis is treated with ibuprofen, and turf toe is an injury related to the tendons that is treated

with rest and steroid shots. (*Id.*) At the visit, the nurse scratched out "refer to MD," indicating that she felt there was no need for a referral to the doctor. (*Id.*) At Stateville, if a nurse examines a patient and does not refer the patient to the doctor, then the patient is not put on the doctor's sick call list. (*Id.* ¶ 21.) At their depositions, Dr. Obaisi and Dr. Tilden both indicated that they were unfamiliar with the term or diagnosis "turf toe." (*Id.* ¶ 20.)

Subsequently, on February 4, 2014, McCoy was evaluated by physician assistant ("PA") Owikoti, who assessed McCoy's toe injury as post-traumatic arthropathy (a term indicating a general issue with the joint) and possible ligament tear. (*Id.* ¶ 22; Owikoti Dep. at 110:1–4, Ex. F to DSF.) PA Owikoti testified that MRIs can be used to diagnose ligament or tendon damage, but that "regular folks" (as opposed to professional athletes, for example) would generally not be given an MRI to diagnose ligament or tendon damage unless the injury was to larger ligament like a knee. (PRDSF ¶ 24; Owikoti Dep. at 15–17.) PA Owikoti further testified that treatment for a possible ligament tear in the big toe would be to maintain function and leave it alone because performing surgery would cause scar tissue. (PRDSF ¶ 22; Owikoti Dep. at 110–12.) McCoy disputes that this is the correct treatment of a possible ligament tear, and points to testimony from Dr. Davis, suggesting her testimony indicates that she would send the patient to a specialist. (PRDSF ¶ 22; Defs.' Resp. to Pl.'s Statement of Additional Facts, Dkt. No. 122 ("DRPSAF") ¶ 19.) Dr. Davis testified that when confronted with symptoms like McCoy's, she would likely "do a course of conservative treatment probably with physical therapy and anti-inflammatories and range of motion exercises . . . if the patient was no better after that, I would have them see a specialist and then let them make the determination from there. In Stateville, I would have had the medical director look at him." (DRPSAF ¶ 19; Davis Dep. at 99–100, Ex. E to DSF.)

On May 5, 2014, McCoy was again evaluated by PA Owikoti because of his ongoing pain in his big toe. (PRDSF ¶ 25.) PA Owikoti again noted post-traumatic arthropathy and prescribed a stronger anti-inflammatory medication because he was concerned that McCoy was unable to bend his toe. (*Id*.) PA Owikoti did not believe that McCoy needed to be referred to a physician. (*Id*.) PA Owikoti testified at his deposition that he reviewed his progress notes from his visit with McCoy and those notes indicated that McCoy had a steady gait, which means that he was walking with a stable gait and was not limping. (*Id*. ¶ 26; Owikoti Dep. at 204:10–21, 207:5–23.) McCoy disputes this assessment and testified at his deposition that he has had a limp since his injury. (PRDSF ¶ 26; DRPSAF ¶ 42; McCoy Dep. at 78:22–79:4, Ex. A to DSF.)

On June 18, 2014, Dr. Obaisi again evaluated McCoy due to complaints of stiffness in his big toe. (PRDSF ¶ 28.) Dr. Obaisi scheduled McCoy for an epidural steroid injection in his toe. (*Id*.) Dr. Obaisi evaluated McCoy again on June 27, 2014 and performed the epidural steroid injunction, which is a long acting anti-inflammatory intended to reduce pain and swelling and enhance the range of motion. (*Id*. ¶ 29.) On December 20, 2014, McCoy fell out of bed and injured his right hand. (*Id*. ¶ 30.) Two days later, Dr. Obaisi ordered an x-ray of McCoy's right toe and right hand. (*Id*. ¶ 31.) The x-ray of the right toe was negative, which meant no fracture, no dislocation, and no subluxation. (*Id*.; Obaisi Dep. at 129:19–130:3.) Dr. Obaisi again evaluated McCoy on December 23, 2014 and prescribed Indocin, a non-steroid anti-inflammatory agent that is slightly more powerful than ibuprofen. (*Id*. ¶ 32.)

Dr. Obaisi evaluated McCoy three more times on January 6, 2015, January 20, 2015, and February 3, 2015. (*Id*. ¶¶ 33–35.) McCoy still had some pain in his right foot, and Dr. Obaisi believed that McCoy might have myositis, or muscle inflammation, which could be related to the stiffness in his toe. (*Id*.) Dr. Obaisi noted that the tendon in McCoy's toe appeared to be intact.

(*Id*.) At the February 3 visit, Dr. Obaisi prescribed pain medication and ordered physical therapy to help McCoy learn how to bend and extend his toe. (*Id*. ¶ 36; DRPAF ¶ 24; Obaisi Dep. at 110:14–111:6.) The parties dispute whether Dr. Obaisi actually prescribed physical therapy as opposed to having merely "ordered" it. McCoy insists that Dr. Obaisi prescribed physical therapy, while Dr. Obaisi claims that he merely ordered it or recommended a consult. (DRPAF ¶¶ 23–26.) In any event, it is undisputed that at the very least, Dr. Obaisi "ordered" physical therapy and that his treatment note includes under the "Plans" heading that McCoy should "consult to PT [physical therapy]." (Obaisi Dep. at 110:14–111:08; Ex. D to DSF at 000067.)

In the approximately 19 months between McCoy's injury and his transfer to Pontiac in February 2015, McCoy was seen at least thirty times by Stateville medical staff about his toe, including many visits with Dr. Obaisi directly, and he received four x-rays. (PRDSF ¶ 40.)

McCoy transferred to Pontiac on February 28, 2015. (*Id*. ¶ 40.) McCoy's medical records describing his medical history at Stateville were also transferred to Pontiac and available to Pontiac medical staff, including Dr. Tilden, Pontiac's medical director. (DRPAF ¶¶ 3, 16, 26.) In fact, Dr. Tilden reviews such notes particularly at the time of transfer. (*Id*. ¶ 3.) On the date of McCoy's transfer, he met with a nurse in urgent care at Pontiac about his toe. (PRDSF ¶ 41.) The nurse prescribed him Indocin. *(Id*.) McCoy met with a nurse again on March 1, 2015 and was added to the physician assistant's sick call at that time. (*Id*. ¶ 42.) McCoy met with PA Caruso on April 1, 2015 and complained of toe pain and received a refill of Indocin. (*Id*.) Dr. Tilden evaluated McCoy on May 10, 2015. (*Id*. ¶ 43.) At that visit, Dr. Tilden noted that McCoy had an old trauma to his right big toe, with a two-year history of tenderness, a decreased range of motion on flexion, and a normal range of motion on extension. (*Id*. ¶ 44.) Dr. Tilden testified at his deposition that McCoy functioned well, ambulated well, and walked with a normal gait, and that

the examination did not reveal any issues. (*Id*.; Tilden Dep. at 54:4–22, Ex. C to DSF.) Again, McCoy disputes that he had a normal gait and testified at his deposition that he has had a limp since his injury. (PRDSF ¶ 44; DRPAF ¶ 42; McCoy Dep. at 78:22–79:4.) Dr. Tilden testified that as a result of this visit, he did not think that McCoy needed physical therapy—given that McCoy presented with a benign, old, minor trauma that he dealt with extremely well. (PRDSF ¶ 45; Tilden Dep., 90:20–91:24.)

Dr. Tilden testified that after the May 10 visit, McCoy did not request a visit or follow-up for the next year. (PRDSF ¶ 46; Tilden Dep. 55:10–14.) McCoy disputes this, pointing to the two grievances he filed after May 10 while at Pontiac. (PRDSF ¶ 46; DRPAF ¶¶ 64–65.) McCoy filed grievances in July 2016 and in August 2016, indicating that he had been receiving Indocin for pain in his foot and needed a renewal of his prescription, that without the prescription he experienced "overwhelm[ing]" and "unbearable" pain, and that he desired to see Dr. Tilden about the issue. (Ex. C to Pl.'s Statement of Additional Facts, Dkt. No. 112 ("PSAF") at pp. 15–20.) In October 2015, McCoy was evaluated by PA Ojelade with a request for Indocin renewal for the pain in his right big toe. (PRDSF ¶ 51.) On January 16, 2016, Dr. Tilden met with McCoy in the asthma clinic and renewed his Indocin prescription. (*Id*. ¶ 52.) Dr. Tilden testified at his deposition on May 25, 2016 that since January 16, 2016, McCoy had not made any further requests for treatment related to his toe. (*Id*. ¶ 53.) McCoy disputes this and states that he continued to complain about his toe injury throughout his incarceration at Pontiac. (*Id*.; PSAF ¶ 45.) McCoy does not put forward evidence showing additional complaints during this time but points to the affidavit he filed along with his statement of facts. (*Id*.; PSAF ¶ 45 and Ex. A.) McCoy was transferred from Pontiac to Menard Correctional Center ("Menard") in April 2017. (PRDSF ¶ 2.)

After the instant motion for summary judgment was briefed, McCoy filed a sur-reply and supporting x-ray report indicating that after his transfer to Menard, he received another x-ray of his toe on May 26, 2017. (Pl.'s Sur-Reply in Opp. to Defs.' Mot. for Sum. J., Dkt. No. 123, at Ex. A.) The x-ray report from Dr. Yousuf indicates that the x-ray reveals a "partial dislocation of the interphalangeal joint." (*Id*.) McCoy subsequently transferred back to Pontiac in June 2017. (*Id*. at Ex. B ¶ 7.) McCoy states in his affidavit that since transferring back to Pontiac, he has not received any further medical treatment for his big toe beyond the prescription of pain medication. (*Id*. at Ex. B ¶ 12.) Along with their response, Defendants filed an affidavit from Dr. Tilden expressing the opinion that the partial dislocation found on the May 2017 x-ray was not related to McCoy's July 2013 original injury and that there is no reason to change the current medical treatment of McCoy's toe based on the findings in the May 2017 x-ray report. (Defs.' Resp. to P's Sur-Reply at Ex. 1, Dkt. No. 128.)

## DISCUSSION

Summary judgment is appropriate when the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). If the movant clears this hurdle, the nonmovant must point to admissible evidence in the record to show that a genuine dispute exists. *Id*. The mere existence of a factual dispute is insufficient to overcome a motion for summary judgment; the nonmovant "must present definite, competent evidence in rebuttal." *Parent v. Home Depot U.S.A., Inc.*, 694 F.3d 919, 922 (7th Cir. 2012). "In a § 1983 case, the plaintiff bears the burden of proof on the constitutional deprivation that underlies the claim, and thus must come forward with sufficient evidence to create genuine issues of material fact to avoid summary judgment." *McAllister v. Price*, 615 F.3d 877, 881 (7th

Cir. 2010). At the summary judgment stage, evidence is viewed in the light most favorable to the nonmovant. *Id*.

I.     **Exhaustion of Administrative Remedies**

Defendants argue that McCoy's claims are barred because he failed to exhaust his administrative remedies through the IDOC grievance process. Under the Prison Litigation Reform Act, prisoners are required to exhaust all administrative remedies before bringing a civil action in federal court based on prisoner conditions. 42 U.S.C. § 1997(e)(a). Defendants may raise the affirmative defense of exhaustion, and they carry the burden of proof for demonstrating failure to exhaust. *Dole v. Chandler*, 438 F.3d 804, 809 (7th Cir. 2006). The Court must resolve the question of whether McCoy exhausted his administrative remedies prior to considering the merits of his deliberate indifference claim. *See Fluker v. Cty. of Kankakee*, 741 F.3d 787, 793 (7th Cir. 2013).

The grievance process for prisoners in IDOC custody usually includes three distinct levels of review. First, a prisoner must submit a grievance to a counselor. 20 Ill. Admin. Code § 504.810. Next, if the prisoner is not satisfied with the counselor's resolution, he must submit a formal grievance to the Grievance Officer. *Id*. at § 504.820. The Grievance Officer reviews the grievance and forwards his recommendation to the Chief Administrative Officer, who makes the final decision at the institutional level. *Id*. at § 504.830(e). Last, if the prisoner is not satisfied with the Chief Administrative Officer's response, he may file an appeal to the Administrative Review Board within 30 days after the date of the Chief Administrative Officer's decision. *Id*. at § 504.850(a)–(c); *see also Dole*, 438 F.3d at 806–07.

Defendants contend that McCoy failed to exhaust his administrative remedies because he failed to complete the final step properly by appealing his August 10, 2013 grievance to the

Administrative Review Board within 30 days of the Chief Administrative Officer's decision. (Defs.' Mem., Dkt. 102 at 15; DSF ¶ 58; Defs.' Rep., Dkt. 121 at 13.) The undisputed facts and attached grievances establish that on August 10, 2013 McCoy filed a grievance with a counselor regarding the lack of treatment on his toe while at Stateville, his ongoing pain, and Dr. Obaisi's improper diagnosis. (DRPSAF ¶57; Ex. H to DSF at 1.) The grievance was sent to the Grievance Officer, and McCoy received a written denial of his grievance from the Chief Administrative Officer on October 21, 2013. (DRPSAF ¶ 58; Ex. H to DSF at 5.) McCoy appealed the grievance denial to the Administrative Review Board on November 6, 2013—well within the 30-day window provided in the administrative rules. (DRPSAF ¶ 59; Ex. B to PSAF.) The Administrative Review Board denied McCoy's appeal. (DRPSAF ¶ 60.) McCoy filed his original complaint in this case on May 14, 2014, after this administrative review process was complete. (Dkt. No. 1.) Defendants do not appear to dispute any of these facts and do not point to any evidence to the contrary. Defendants have therefore failed to meet their burden of showing that McCoy failed to exhaust his administrative remedies.[1]

## II. Merits of McCoy's § 1983 Claim

The Eighth Amendment, through the Fourteenth Amendment, imposes a duty upon states to provide adequate medical care to incarcerated individuals. *See, e.g.*, *Johnson v. Doughty*, 433 F.3d 1001, 1010 (7th Cir. 2006). "To determine if the Eighth Amendment has been violated in the

---

[1] Defendants do not raise the separate argument that McCoy did not exhaust his administrative remedies with respect to Dr. Tilden on the basis that McCoy filed his amended complaint adding Dr. Tilden as a defendant before any grievance naming Dr. Tilden had made it through the entire administrative grievance process. Because Defendants do not make this argument, the Court need not address it here. *See Fluker*, 741 F.3d at 791 ("Defendants may waive or forfeit reliance on § 1997(e)(a), just as they may waive or forfeit the benefit of a statute of limitations." (internal quotation marks omitted)). The Seventh Circuit has made clear that "[f]ailure to exhaust administrative remedies does not deprive a court of jurisdiction" and where, as here, discovery is complete and summary judgment on the merits is fully briefed, "it [makes] perfect sense" for a district court to go on to address summary judgment. *Id*. at 792–93 (internal quotation marks omitted).

prison medical context, [the Court] perform[s] a two-step analysis, first examining whether a plaintiff suffered from an objectively serious medical condition, and then determining whether the individual defendant was deliberately indifferent to that condition." *Petties v. Carter*, 836 F.3d 722, 727–28 (7th Cir. 2016).

### A. Objectively Serious Medical Condition

A serious medical condition is characterized by "the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain." *Hayes v. Snyder*, 546 F.3d 516, 523 (7th Cir. 2008) (internal quotation marks omitted). A condition could also be objectively serious if a "failure to treat [it] could result in . . . the unnecessary and wanton infliction of pain." *Id*. at 522 (internal quotation marks omitted). The Seventh Circuit has found that "a broad range of medical conditions may be sufficient to meet the objective prong of a deliberate indifference claim, including a dislocated finger, a hernia, arthritis, heartburn and vomiting, a broken wrist, and minor burns sustained from lying in vomit." *Roe v. Elyea*, 631 F.3d 843, 861 (7th Cir. 2011).

McCoy's testimony suggests that his toe was extremely painful and impacted his daily life, and that he could not bear weight on his foot or walk without a limp. Chronic and substantial pain is sufficient to show a serious medical condition. *See, e.g.*, *Hayes*, 546 F.3d at 523. Thus, viewing the evidence in the light most favorable to McCoy as the nonmovant, McCoy has put forth sufficient evidence from which a reasonable jury could conclude that he had an objectively serious medical condition.

### B. Deliberate Indifference

To show deliberate indifference, "a plaintiff must provide evidence that an official ***actually*** knew of and disregarded a substantial risk of harm." *Petties,* 836 F.3d at 728 (emphasis

in original). "[S]howing mere negligence is not enough. Even objective recklessness—failing to act in the face of an unjustifiably high risk that is so obvious that it ***should*** be known—is insufficient to make out a claim." *Id.* (internal citations omitted; emphasis in original). Rather, "the defendant must know of facts from which he could infer that a substantial risk of serious harm exists, and he must actually draw the inference." *Zaya v. Sood*, 836 F.3d 800, 804 (7th Cir. 2016). Where a defendant "denies knowing that he was exposing a plaintiff to a substantial risk of serious harm, evidence from which a reasonable jury could infer a doctor knew he was providing deficient treatment is sufficient to survive summary judgment." *Petties*, 836 F.3d at 726.

"A medical professional acting in his professional capacity may be held to have displayed deliberate indifference only if the decision by the professional is such a substantial departure from accepted professional judgment, practice, or standards, as to demonstrate that the person responsible actually did not base the decision on such a judgment." *Rasho v. Elyea*, 856 F.3d 469, 476 (7th Cir. 2017) (internal quotation marks omitted). Put another way, a medical professional's response must be "so inadequate that it demonstrate[s] an absence of professional judgment, that is, that no minimally competent professional would have so responded under those circumstances." *Collignon v. Milwaukee Cnty.*, 163 F.3d 982, 989 (7th Cir. 1998). Evidence that "some medical professionals would have chosen a different course of treatment is insufficient to make out a constitutional claim." *Petties*, 836 F.3d at 729; *see also Zaya*, 836 F.3d at 804 ("By definition a treatment decision [that is] based on professional judgment cannot evince deliberate indifference because professional judgment implies a choice of what the defendant believed to be the best course of treatment.").

A court looks at the "totality of an inmate's medical care when considering whether that care evidences deliberate indifference to serious medical needs." *Petties,* 836 F.3d at 728. A

prison official persisting in a course of treatment known to be ineffective may "establish a departure from minimally competent medical judgment" sufficient to establish deliberate indifference. *Id.* at 729–730. In addition, "[i]f a prison doctor chooses an easier and less efficacious treatment without exercising professional judgment, such a decision can also constitute deliberate indifference." *Id.* at 730 (internal quotation marks omitted). Specifically, where there is evidence that a defendant did not alter his or her response to a condition despite repeated complaints of enduring pain or lack of improvement to the condition, this creates an issue of fact sufficient to defeat summary judgment. *See Petties*, 836 F.3d at 731 (indicating that "evidence that the patient repeatedly complained of enduring pain with no modifications in care" can create a fact issue for the jury); *see also Gonzalez v. Feinerman*, 663 F.3d 311, 315 (7th Cir. 2011) (reversing dismissal of complaint where defendant "never altered their response to [plaintiff's condition] as the condition and associated pain worsened over time").

Similarly, the Seventh Circuit in *Greeno v. Daley*, 414 F.3d 645, 655 (7th Cir. 2005), found that the plaintiff created an issue of fact sufficient to defeat summary judgment because "a jury could find deliberate indifference from [defendant's] refusal over a two-year period to refer [plaintiff] to a specialist or authorize an endoscopy" despite persistent complaints of pain and requests to see a specialist. And in *Berry v. Peterman*, 604 F.3d 435, 441–42 (7th Cir. 2010), the Seventh Circuit reversed a grant of summary judgment for the defendant where, despite repeated complaints by the plaintiff that the pain medication was not helping and "modest request[s]" to be referred to a dentist, the defendant persisted in her "obdurate refusal to alter [the plaintiff's] course of treatment." The *Berry* court held that "a jury could reasonably conclude that [the defendant] knowingly adhered to an easier method to treat [the plaintiff's] pain that she knew was not effective. She had not identified an effective pain medication, nor could she explain [the

plaintiff's] pain, yet she rejected the obvious alternative of referring [the plaintiff] to a dentist." *Id.* at 441. *See also Keller v. Feinerman*, No. 3:06-CV-661, 2011 WL 1519384, at *3 (S.D. Ill. Apr. 20, 2011) (denying summary judgment for the defendant because "a jury could conclude that [the defendant] persisted in an easier method to treat the Plaintiff's pain that he knew was ineffective" where the defendant "was unable to identify the source of [the] Plaintiff's throat pain" yet "refused to refer the Plaintiff to an ENT specialist for a period of nearly a year"); *Beard v. Obaisi*, 2013 WL 3864415, at *4 (C.D. Ill. July 25, 2013) (denying summary judgment because "a prison doctor cannot avoid liability by continuing to prescribe ineffective treatment and refusing to order tests or referrals needed to properly diagnose the condition" and "arguably something more was required to at least confirm [the defendant's] diagnosis of the cause of Plaintiff's pain and [the defendant's] decision that surgery should not be considered").

Here, the undisputed facts establish that during the approximately nineteen months after his initial injury, McCoy met with Stateville medical staff at least thirty times about his toe pain, including at least nine visits directly with Dr. Obaisi interspersed throughout this period. Dr. Obaisi had access to treatment notes regarding McCoy's visits with other medical staff. (DRPSAF ¶¶ 16, 26.) Despite almost nineteen months of McCoy's repeated medical visits for toe pain, complaints about his toe, noted inflammation and difficulty with toe movement, and possibly a visible limp,[2] Dr. Obaisi never altered from his course of treatment involving pain medication and anti-inflammatories and never referred McCoy to a specialist or ordered any testing beyond repeated x-rays. This is enough to create a factual issue sufficient to allow a jury to determine whether Dr. Obaisi acted with deliberate indifference. *See Petties*, 836 F.3d 722; *Greeno,* 414 F.3d 645; *Berry,* 604 F.3d 435. After McCoy's transfer to Pontiac, Dr. Tilden continued in this course of treatment despite information in McCoy's medical records about the previous two years

---

[2] McCoy has created a factual issue as to whether he walked with a pronounced limp.

of toe pain, did not refer McCoy to a physical therapist despite Dr. Obaisi's February 2015 treatment plan note to send McCoy for a physical therapy consult, and declined to alter the course of treatment once a Menard physician indicated that a May 2017 x-ray showed a partial joint dislocation in McCoy's toe. This, too, is enough to create a factual issue sufficient to allow a jury to determine whether Dr. Tilden acted with deliberate indifference.

Because McCoy has identified a genuine issue of material fact as to whether Dr. Tilden and Dr. Obaisi acted with deliberate indifference, the motion for summary judgment as to those Defendants is denied.[3] Because Defendants' motion as to Defendant Wexford is premised only upon the propriety of summary judgment for the individual Defendants, the motion is denied as to Defendant Wexford as well.

### III. Punitive Damages

Defendants further argue that even if the Court holds that Defendants are not entitled to summary judgment on liability, the Court should nevertheless grant summary judgment for Defendants on McCoy's claim for punitive damages. However, as the Seventh Circuit has noted, the standard for punitive damages for a § 1983 claim is the same as the standard for liability. *Woodward v. Corr. Med. Servs. of Ill., Inc.*, 368 F.3d 917, 930 (7th Cir. 2004) ("Punitive damages are recoverable in § 1983 actions where the defendant had a reckless or callous disregard to the federally protected rights of others. This is the same standard as for § 1983 liability." (internal citation omitted)); *Walsh v. Mellas*, 837 F.2d 789, 801–02 (7th Cir. 1988) (similar). The Court therefore denies Defendants' motion for summary judgment as to punitive damages as well.

---

[3] As Defendants concede in their Reply, the Seventh Circuit has held that medical staff at a correctional institution that are employed by a private contractor, such as Wexford, are not entitled to a qualified-immunity defense. Defendants are thus not entitled to such a defense here. *Petties*, 836 F.3d at 734; *Rasho*, 856 F.3d at 479.

## CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment (Dkt. No. 101) is denied.

ENTERED:

Dated: October 15, 2018

_____
Andrea R. Wood
United States District Judge